# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued October 20, 2006          Decided April 20, 2007

No. 05-3190

UNITED STATES OF AMERICA,
APPELLEE

v.

ANTONIO C. BRAS,
APPELLANT

Appeal from the United States District Court
for the District of Columbia
(No. 03cr00051-01)

*Joseph J. Aronica* argued the cause and filed the briefs for appellant.

*Suzanne G. Curt*, Assistant U.S. Attorney, argued the cause for appellee. With her on the brief were *Kenneth L. Wainstein*, U.S. Attorney at the time the brief was filed, and *Roy W. McLeese, III*, *Thomas J. Tourish, Jr.*, and *Steven J. Durham*, Assistant U.S. Attorneys.

Before: GARLAND and BROWN, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* GARLAND.

GARLAND, *Circuit Judge*: Antonio C. Bras pled guilty to conspiracy to commit bribery and highway project fraud in violation of 18 U.S.C. § 371, an offense for which the statutory maximum is five years in prison. He was sentenced to 37 months' incarceration under the regime announced in *United States v. Booker*, 543 U.S. 220 (2005). The validity of that sentence is the only issue on appeal.

Bras raises four challenges to his sentence. First, he contends that the district court sentenced him in violation of *Booker* principles, because it increased his sentence based on facts found by the court itself, using a preponderance of the evidence standard. Second, Bras maintains that the court violated his Sixth Amendment right to confront the witnesses against him, by increasing his sentence based upon testimonial evidence that was not subject to cross-examination. Third, he argues that the court used unreliable evidence to calculate the loss that his crime caused the government, and thereby erred in calculating his advisory Sentencing Guidelines range. Finally, Bras claims that his sentence was unreasonable, because the district court failed to adequately consider the relevant statutory sentencing factors. Finding these challenges to be without merit, we affirm the judgment of the district court.

I

On February 5, 2003, a grand jury issued a fifteen-count indictment against defendant Bras, charging him with participating in a conspiracy in which Fort Meyer Construction Corporation, through the use of bribes and false documents, overcharged the District of Columbia Department of Public Works (DPW) for asphalt used to pave District streets. *See* 18 U.S.C. §§ 371 (conspiracy to commit an offense against or to defraud the United States), 201 (bribery of a public official), 1020 (highway project fraud). Trial commenced on December

1, 2003. The evidence at trial, supplemented by the defendant's admissions during his mid-trial guilty plea, established the following facts.

Fort Meyer contracted with the DPW to repair and resurface roads in the District of Columbia. Using funds provided largely by the Federal Highway Administration, the District paid Fort Meyer based on the weight of asphalt it delivered, in amounts ranging from $38 to $50 per ton. The amount of asphalt delivered in each truckload was recorded on an "asphalt ticket," which a Fort Meyer employee gave to a DPW employee when the asphalt arrived on site. At the end of each day, relying on the asphalt tickets, a DPW inspector prepared an Inspector's Daily Report (IDR), which recorded the total weight of asphalt delivered to the job site. After the data from the IDRs was entered into a computer, the DPW prepared a voucher that authorized payment to Fort Meyer for the asphalt and paving work.

Bras was initially employed by Fort Meyer as an asphalt foreman. He was promoted to asphalt superintendent in October 1996, when his superior, Keith Armentrout, could no longer perform his day-to-day responsibilities due to health problems. Thereafter, Bras was responsible for ensuring that Fort Meyer delivered the proper amount of asphalt to DPW job sites.

As superintendent, Bras continued a bribery scheme that had been initiated by Armentrout. Bras conspired with other Fort Meyer employees, and with DPW inspectors and engineers, to pay the DPW employees to accept false asphalt tickets reflecting tons of asphalt that had never been delivered. The DPW employees then prepared IDRs that included the false weights, and the DPW paid Fort Meyer based on the resulting calculations. At trial, five DPW employees -- inspectors David Brown and Thomas Smith, and engineers Timothy Martin,

Clarence Short, and Jonathan Gant -- testified that they took bribes from Bras as part of this scheme.

At the close of the government's case, the district court dismissed eight of the fifteen counts against Bras. The following Monday, pursuant to a written plea agreement, Bras pled guilty to Count One of the original indictment (which had not been dismissed). That count charged Bras with conspiring to defraud the United States and to bribe DPW employees to accept false tickets for never-provided asphalt, in violation of 18 U.S.C. § 371. At the subsequent plea proceeding, Bras signed a Statement of Facts that was read into the record. The Statement described the aforementioned bribery scheme and listed numerous specific occasions, from July 16, 1997, to September 24, 1997, upon which Bras gave false asphalt tickets to DPW employees, thereby "inflating the quantity of asphalt delivered to a job site" and "fraudulently inflating" a federal contract. Appendix (App.) 42-43.

The final sentencing proceedings in the case took place after the Supreme Court issued its opinion in *United States v. Booker*, which excised the federal statutory provisions that made the United States Sentencing Guidelines mandatory, and thus rendered the Guidelines "effectively advisory." 543 U.S. at 245-46; *see United States v. Simpson*, 430 F.3d 1177, 1182 (D.C. Cir. 2005). Looking to the Guidelines for advice, the court began with the appropriate guideline for the offense to which Bras pled guilty. *See* U.S. Sentencing Guidelines Manual § 2C1.1 (2000) [hereinafter U.S.S.G.] (offering or giving a bribe); *see also id*. § 2X1.1 (conspiracy).[1] This guideline begins with a base offense level of 10, *see id*. § 2C1.1(a), to which the court

---

[1]Bras was sentenced under the 2000 edition of the Guidelines. *See* Gov't Br. 24 n.23. Accordingly, the citations in this opinion are to that edition.

added two levels because Bras participated in more than one bribe, *see id*. § 2C1.1(b)(1). The guideline further instructs that, if the loss to the government exceeds $2,000, the offense level should be increased based upon the amount of loss. *See id.* § 2C1.1(b)(2)(A) (referencing loss table at U.S.S.G. § 2F1.1). After two days of evidentiary hearings, the court determined that the loss to the government was at least $41,000, which corresponded to a five-level increase in the offense level. *See id*. § 2F1.1(b)(1)(F). The court also found that Bras was an organizer or leader of the scheme, which added an additional four levels. *See id.* § 3B1.1(a).

The resulting offense level was 21, which, in light of the fact that Bras had no prior convictions, yielded an advisory Guidelines range of 37 to 46 months' incarceration. *See id*. ch. 5, pt. A (sentencing table). After further consideration of other sentencing factors, the district court sentenced him to a 37-month prison term. Bras now appeals his sentence, charging that the court committed a variety of errors in the course of calculating the sentence.

In *Booker*, the Supreme Court instructed appellate courts to review sentencing decisions under a "'reasonableness' standard." 543 U.S. at 262. It also declared that, even "[w]ithout the 'mandatory' provision" that it had excised from the Sentencing Reform Act, "the Act nonetheless requires judges to take account of the Guidelines together with other sentencing goals" listed in the statute. *Id*. at 259 (citing 18 U.S.C. § 3553(a)). A sentencing court acts unreasonably if it commits legal error in the process of taking the Guidelines or other factors into account, or if it fails to consider them at all. *See Simpson*, 430 F.3d at 1185-87; *United States v. Price*, 409 F.3d 436, 442-43 (D.C. Cir. 2005). A defendant may also challenge the length of a sentence as unreasonable, although we have held that "a sentence within a properly calculated

Guidelines range is entitled to a rebuttable presumption of reasonableness." *United States v. Dorcely*, 454 F.3d 366, 376 (D.C. Cir. 2006). With these precepts in mind, we turn to an examination of Bras' sentencing challenges.

II

Bras' first contention is that the district court sentenced him in violation of *Booker* principles, because it increased his sentence based on facts found by the court, using a preponderance of the evidence standard. According to Bras, *Booker* held that, in "applying . . . the Guidelines," any fact that is "'necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt.'" Appellant's Br. 11 (quoting *Booker*, 543 U.S. at 244). Based only on the facts Bras admitted in his plea, he contends that "the proper maximum authorized sentence would be the 16 month maximum sentence allowed for an Offense Level of 12, comprised in this case of a Base Offense Level of 10 with a 2-level enhancement for making more than one bribe." Reply Br. 3. On this calculation, the resulting sentencing range would have been 10 to 16 months, which Bras argues should have been reduced still further by consideration of other sentencing factors. Instead, Bras asserts, the court "erroneously relied on additional facts the court found by a mere preponderance" -- particularly facts regarding the amount of the government's loss -- "to impose an enhanced sentence of 37 months." *Id*.

Bras misapprehends the meaning of *Booker*. As we have previously explained, *see Simpson*, 430 F.3d at 1182, *Booker* consisted of two separate majority opinions. In the first, "substantive" opinion, the Supreme Court held that the Sixth Amendment is violated when a court imposes a sentence under

a set of mandatory guidelines based on its own determination of "[a]ny fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict . . . ." *Booker*, 543 U.S. at 244. The Court emphasized, however, that this conclusion "rests on the premise . . . that the relevant sentencing rules are mandatory and impose binding requirements on all sentencing judges." *Id*. at 233. "If the Guidelines as currently written could be read as merely advisory provisions that recommended, rather than required, the selection of particular sentences in response to differing sets of facts, their use would not implicate the Sixth Amendment" even if it yielded a sentence above that based on a plea or verdict alone. *Id*.; *see Cunningham v. California*, 127 S. Ct. 856, 866 (2007); *United States v. Adewani*, 467 F.3d 1340, 1341 (D.C. Cir. 2006); *Simpson*, 430 F.3d at 1182.

In the second, "remedial" opinion, the Court found that the statutory provisions making the Guidelines mandatory were "incompatible with [*Booker*'s] constitutional holding" and had to be "severed and excised." *Booker*, 543 U.S. at 245. "So modified," the Court said, "the federal sentencing statute makes the Guidelines effectively advisory." *Id*. (citations omitted). And so modified, the Court made clear, the Sixth Amendment's bar against judicial fact-finding does not apply to Guidelines sentencing. Although judges are still required "to take account of the Guidelines together with other sentencing goals," without "the provision that makes 'the relevant sentencing rules . . . mandatory . . . ,' the statute falls outside [the constitutional] requirement." *Id*. at 259 (quoting *id*. at 233 ("substantive" opinion)); *see id*. at 252; *Adewani*, 467 F.3d at 1341; *Simpson*, 430 F.3d at 1182.

Indeed, of the multiple opinions issued in *Booker*, only one comes close to espousing the view urged by defendant Bras.

That is the dissent to the Court's remedial opinion, which proposed, as a remedy, that the Guidelines remain mandatory and the government "prove any fact that is required to increase a defendant's sentence under the Guidelines to a jury beyond a reasonable doubt." 543 U.S. at 284-85 (Stevens, J., dissenting) (emphasis omitted). The majority, however, expressly rejected this view. *Id*. at 258-59 ("remedial" opinion). Accordingly, we do so as well.

Bras further contends that, even if "judicial fact-finding were permissible as a basis for imposing sentencing enhancements, . . . such fact-finding must be subject, not to a mere preponderance standard, but to the more exacting beyond a reasonable doubt standard." Appellant's Br. 16 (internal quotation marks omitted). There is no support for this proposition, which is contrary to the Guidelines' instruction that "use of a preponderance of the evidence standard is appropriate to meet due process requirements and policy concerns in resolving disputes regarding application of the guidelines to the facts of a case." U.S.S.G. § 6A1.3 cmt.

Prior to *Booker*, both the Supreme Court and this court had "upheld the Guidelines' application of the preponderance of the evidence standard," *Dorcely*, 454 F.3d at 372-73 (citing *United States v. Watts*, 519 U.S. 148, 157 (1997), and *United States v. Long*, 328 F.3d 655, 670-71 (D.C. Cir. 2003)). If anything, *Booker* appeared to reaffirm that precedent. *See* 543 U.S. at 251 ("remedial" opinion) (noting that the Court "held in *United States v. Watts* that a sentencing judge could rely for sentencing purposes upon a fact that a jury had found *unproved* (beyond a reasonable doubt)" (citation omitted)). Following *Booker*, this court rejected the contention that a sentencing judge may not rely on facts found merely by preponderance when a jury has previously acquitted a defendant of the same conduct. *See Dorcely*, 454 F.3d at 372-73. If a court may rely on *acquitted*

conduct when proven by preponderance, reliance on previously *untried* conduct proven under that standard is a fortiori permissible.

We therefore reject Bras' contention that a judge may not make findings of fact when employing the Sentencing Guidelines in an advisory fashion, as well as his fall-back position that any such fact-finding must be made under a beyond a reasonable doubt standard. *Accord, e.g.*, *United States v. Smith*, __ F.3d __, No. 06-14077, slip op. at 3 (11th Cir. Mar. 19, 2007); *United States v. Hawkins*, __ F.3d __, No. 05-4311, slip op. at 4 (7th Cir. Mar. 9, 2007); *United States v. Dare*, 425 F.3d 634, 639-42 (9th Cir. 2005); *United States v. Magallanez*, 408 F.3d 672, 684-85 (10th Cir. 2005); *United States v. Mares*, 402 F.3d 511, 519 n.6 (5th Cir. 2005).

III

Bras' second contention is that the district court violated his Sixth Amendment right to confront the witnesses against him by increasing his sentence based upon "testimonial hearsay evidence that was not subject to cross-examination." Appellant's Br. 19.  In support, he cites the Supreme Court's decision in *Crawford v. Washington*, 541 U.S. 36 (2004), and re-cites *Booker* for the proposition that "the protections of the Sixth Amendment are afforded to defendants during sentencing proceedings."  Appellant's Br. 20 (emphasis omitted).

Long before the advent of the Sentencing Guidelines, the Supreme Court upheld, against constitutional attack, the "age-old practice of seeking information from out-of-court sources to guide [a court's] judgment toward a more enlightened and just sentence." *Williams v. New York*, 337 U.S. 241, 250-51 (1949). The sentencing judge "is not restricted," the Court said, "to evidence derived from the examination and cross-examination

of witnesses in open court but may . . . consider responsible unsworn or 'out-of-court' information," *Williams v. Oklahoma*, 358 U.S. 576, 584 (1959), and "may appropriately conduct an inquiry broad in scope, largely unlimited either as to the kind of information he may consider, or the source from which it may come," *United States v. Tucker*, 404 U.S. 443, 446 (1972). Nor were the hearsay (or other) provisions of the Federal Rules of Evidence made applicable to sentencing. *See* FED. R. EVID. 1101(d)(3).

In the Sentencing Reform Act of 1984, Congress followed this tradition by recodifying an earlier statute, which provided that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3661 (recodifying 18 U.S.C. § 3577, without change). Following Congress' lead, the Sentencing Guidelines state that, "[i]n determining the relevant facts, sentencing judges are not restricted to information that would be admissible at trial." U.S.S.G. § 6A1.3 cmt. Our decisions, and those of other courts, have repeatedly concluded that the use of hearsay in Sentencing Guidelines determinations does not violate the Constitution. *See, e.g.*, *In re Sealed Case*, 246 F.3d 696, 700 (D.C. Cir. 2001); *United States v. Drew*, 200 F.3d 871, 879 (D.C. Cir. 2000); *United States v. Shevi*, 345 F.3d 675, 679 (8th Cir. 2003); *Todd v. Schomig*, 283 F.3d 842, 853 (7th Cir. 2002); *United States v. Zlatogur*, 271 F.3d 1025, 1031 (11th Cir. 2001); *United States v. Berry*, 258 F.3d 971, 976 (9th Cir. 2001).

In *Crawford*, the Supreme Court held that "testimonial statements of a witness who d[oes] not appear at trial" are inadmissible "unless he [is] unavailable to testify and the defendant ha[s] had a prior opportunity for cross-examination." 541 U.S. at 53-54. As the quotation indicates, *Crawford* applies

only to "testimonial" evidence, and much of what Bras' sentencing court relied on, *see infra* Part IV, does not fall within that ambit.  *See id.* at 56 (noting that business records "by their nature [are] not testimonial").  Moreover, as the quotation further reflects, *Crawford* was a case about the right to confrontation *at trial*.  *See also Whorton v. Bockting*, 127 S. Ct. 1173, 1182 (2007) (describing the purpose of the "*Crawford* rule" as "ensuring that inaccurate out-of-court testimonial statements are not used *to convict* an accused" (emphasis added)).  Nothing in *Crawford* suggests that the Court intended to overturn its precedents permitting the use of hearsay at sentencing.  We are certainly not at liberty to do so.  *See Agostini v. Felton*, 521 U.S. 203, 237-38 (1997).

Nor does *Booker* suggest that a sentencing court may not rely on hearsay.  As noted in Part II, *supra*, *Booker* held that the Sixth Amendment right to a jury's determination of facts does not extend to determinations made under advisory guidelines. 543 U.S. at 233 ("substantive" opinion); *id.* at 259 ("remedial" opinion).  Moreover, the Court expressed its understanding that Congress' direction, that "'[n]o limitation shall be placed on the information . . . which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence,'" would continue in force under the modified Guidelines regime that *Booker* instituted.  *Id.* at 251  (quoting 18 U.S.C. § 3661) ("remedial" opinion).

We therefore reject Bras' challenge, and we join our sister circuits in holding that nothing in *Crawford* or *Booker* "'alter[s] the pre-*Crawford* law that the admission of hearsay testimony at sentencing does not violate confrontation rights.'" *United States v. Brown*, 430 F.3d 942, 944 (8th Cir. 2005) (quoting *United States v. Chau*, 426 F.3d 1318, 1323 (11th Cir. 2005)); *see United States v. Littlesun*, 444 F.3d 1196, 1199-1200 (9th Cir. 2006); *United States v. Katzopoulos*, 437 F.3d 569, 576 (6th Cir.

2006); *United States v. Stone*, 432 F.3d 651, 654 (6th Cir. 2005); *United States v. Roche*, 415 F.3d 614, 618 (7th Cir. 2005); *United States v. Luciano*, 414 F.3d 174, 179 (1st Cir. 2005); *United States v. Martinez*, 413 F.3d 239, 243-44 (2d Cir. 2005).

IV

"Even assuming, arguendo, that the *Crawford* test were inapplicable," Bras maintains that a sentencing court may not rely on hearsay evidence unless it is "reliable." Appellant's Br. 22. Here, he is on firm legal ground. The Guidelines admonish that, although the sentencing court may rely on evidence that would be inadmissible at trial, the evidence must nonetheless have "sufficient indicia of reliability to support its probable accuracy." U.S.S.G. § 6A1.3. But while Bras insists that the court used unreliable evidence to calculate the value of the loss that his offense caused, we find to the contrary.

A

We begin with a description of the sentencing proceedings undertaken by the district court. The court conducted a two-day evidentiary hearing to determine how to calculate the loss to the government, at which FBI Special Agent Kimberly Alaniz testified at length. Through Alaniz's testimony, the government submitted a series of summary charts estimating the loss resulting from the scheme at $512,165.18. Alaniz testified that she prepared the charts based on documents obtained from Fort Meyer, from DPW records, and from a box of records kept by Bras' deceased predecessor, Keith Armentrout. After Armentrout's death, his son gave the FBI the box, which contained Fort Meyer Daily Reports, asphalt tickets, photocopies of tickets, handwritten notes, and miscellaneous other documents.

Alaniz explained her methodology as follows. For each day that Fort Meyer delivered asphalt to a DPW site, a Fort Meyer foreman would prepare a Daily Report listing the actual amount of asphalt delivered to a particular location. (These should not be confused with the IDRs -- the daily reports prepared by DPW inspectors that included the weights from the false tickets.) Because it was impossible to tell from the face of an asphalt ticket whether it was false, Alaniz compared the asphalt totals in the Daily Reports with the totals reflected on the asphalt tickets for the same date, contract, and location. When the tickets reflected a greater amount of asphalt than the Daily Report, thus indicating a fraudulent overstatement, she calculated the difference in tons and multiplied that amount by the appropriate price per ton to determine the loss.

Alaniz testified that the asphalt tickets she used for her calculations came almost exclusively from the business records of the DPW. The Daily Reports to which she compared the asphalt tickets came from two sources: the business records of Fort Meyer and the Armentrout box. Alaniz testified that, to ensure the accuracy of the Daily Reports found in the box, she reviewed them with a Fort Meyer official, who certified them as copies of the original Fort Meyer documents. In addition, she spoke with two Fort Meyer foremen, Lawrence Palmer and Steve Kowalik, who examined and authenticated nearly all of the Daily Reports from the Armentrout box that bore their names. Alaniz also testified that, where the numbers recorded on the Daily Reports were scratched out and replaced by higher numbers that matched the final totals submitted to the DPW, she relied on the lower number because Palmer and Kowalik told her the lower numbers were the correct ones. Alaniz further testified that "coring" tests were conducted at questionable paving locations, revealing that less asphalt was laid at those locations than Fort Meyer had been paid to deliver.

Bras raised numerous objections to the government's loss calculations. These included objections to the following: the use of certain documents from the Armentrout box; the decision to rely on scratched-out numbers on specified Daily Reports; and the use of asphalt tickets signed by DPW employee Robert Lewis, which Alaniz included based on deceased co-conspirator Joe Mathis' statements that Lewis had been involved in the false ticket scheme.

Although the court generally approved the government's method of calculating loss, as a first adjustment it asked Alaniz to recalculate the loss by excluding any items not supported by documentary evidence, whether from the Armentrout box or the business records of DPW or Fort Meyer. This dropped the loss from $512,165.18 to $456,959.86, which yielded a nine- rather than ten-level increase under the Guidelines. *See* U.S.S.G. § 2F1.1(b)(1) (loss table). The district court then asked the agent to delete any calculations relying on Daily Reports from the box as to which there were no duplicate business records obtained from the DPW or Fort Meyer. This produced a loss of $226,749, which corresponded to an eight-level enhancement. *See id.* At the final sentencing hearing, the court went through additional iterations, further reducing the loss to eliminate various of the defendant's objections. The court concluded that, although a nine-level enhancement was supported by specific documentation, reduction to a five-level enhancement -- corresponding to a loss of $41,801 -- would "knock out all of [Bras'] complaints about the figure." Sentencing Hr'g Tr. 12 (Oct. 20, 2005); *see id*. at 61. The court then used the five-level enhancement to calculate Bras' total offense level of 21. *See United States v. Bras*, No. 03cr00051-01, at 1 (D.D.C. Oct. 20, 2005) (Judgment).

B

On appeal, Bras challenges the district court's reliance on materials contained in the Armentrout box, on out-of-court statements made to Agent Alaniz by Fort Meyer foremen Palmer and Kowalik regarding the meaning of the scratched-out numbers on their asphalt tickets, and on the plea allocution of co-defendant Joe Mathis with respect to the falsity of asphalt tickets signed by Lewis. In large part, however, the defendant's objections appear to be based on a misunderstanding as to the loss enhancement applied by the court. The court did not accept the government's original loss estimate of $512,165.18 (corresponding to a ten-level increase), nor its first adjusted estimate of $456,959.86 (corresponding to a nine-level increase), nor even its second-order adjustment to $226,749 (corresponding to an eight-level increase). Rather, as the Statement of Reasons filed by the court makes clear, it "determined after [the] evidentiary hearing [a] loss at level 5," which corresponds to the further adjusted loss estimate of $41,801. *Bras*, No. 03cr00051-01, at 1; *see* U.S.S.G. § 2F1.1(b)(1).

We need not decide whether the court could have relied on any of the government's higher estimates in reaching a conclusion regarding the amount of loss. *But see Sealed Case*, 246 F.3d at 700 (holding that hearsay of sufficient reliability may be used at sentencing); *United States v. Nesbitt*, 852 F.2d 1502, 1521 (7th Cir. 1988) (holding that a sentencing judge may rely on information obtained during plea proceedings of co-defendants). Whatever the reliability of those earlier calculations, the $41,801 figure was based on the court's decision to eliminate all calculations about which the defendant had any "complaints." Sentencing Hr'g Tr. 12 (Oct. 20, 2005); *see id*. at 61. When the court explained that this was how it had arrived at the loss figure, the defendant had a fair opportunity to

dispute that his complaints had been taken into account. As the hearing record reflects, and as counsel conceded at oral argument, he did not do so. *See* Oral Arg. Recording at 28:50.

Instead, Bras contends that he never admitted that there was any loss at all. Appellant's Br. 18; Reply Br. 4; Oral Arg. Recording at 25:17.[2] This contention is mystifying. Bras signed the government's Statement of Facts, which described numerous occasions on which Bras gave false asphalt tickets to DPW employees, "thereby inflating" the federal contract. App. 42-43. At his plea proceeding, the court asked Bras whether he understood that "in giving a ticket that indicated some asphalt had been delivered and it hadn't been delivered, . . . Fort Meyer would get paid based on that ticket even though they hadn't delivered any asphalt." Hr'g Tr. 35 (Dec. 8, 2003). Bras answered yes. *Id.*; *see id.* at 32-35.

We further note that, for all of Bras' complaints regarding out-of-court hearsay, the testimony at his trial more-than-confirmed the loss determined by the district court. At Bras' trial, five witnesses -- all available for cross-examination -- testified that Bras had given them between two and five completely false tickets on a daily or almost daily basis. *See* Trial Tr. 97, 99 (Dec. 2, 2003); Trial Tr. 136, 138 (Dec. 3, 2003); Trial Tr. 37, 173, 210 (Dec. 4, 2003); Trial Tr. 49-50, 62 (Dec. 5, 2003). Each ticket represented approximately twenty

---

[2]Bras also argues that, even "[t]hough Agent Alaniz may have depended upon other methods to subsequently verify which tickets she believed false, she would not have known where to begin looking for false tickets out of the universe of 60,000 tickets had she not used Mr. Armentrout's box as a 'guide.'" Appellant's Br. 24. As there is no claim that the box was obtained illegally, there is nothing to this argument. No rule of law bars the government from using hearsay evidence, reliable or not, to help focus a criminal investigation.

tons of never-delivered asphalt. One of the witnesses, Timothy Martin, testified that he had taken three to five such tickets on twenty to thirty occasions in 1997. *See* Trial Tr. 136, 138 (Dec. 3, 2003). Thus, even if the going rate for asphalt on all of those days was at its low of $38 per ton, the loss described by Martin alone was at least $45,600. We have previously upheld sentences based on similar testimonial quantifications. *Cf., e.g.*, *United States v. Graham*, 317 F.3d 262, 270-71 (D.C. Cir. 2003) (affirming a sentencing court's determination of the total quantity of heroin attributed to a defendant based on the testimony of co-conspirators regarding the frequency and amount of individual distributions); *United States v. Young*, 247 F.3d 1247, 1252-53 (D.C. Cir. 2001) (holding that "testimony about a conspirator's intentions alone, even without physical evidence, may be sufficient to establish the amount of drugs contemplated as the object of a conspiracy").

Under the Sentencing Guidelines, "loss need not be determined with precision," and the "court need only make a reasonable estimate of the loss, given the available information." U.S.S.G. § 2B1.1 cmt. n.3. *Accord United States v. Gottfried*, 58 F.3d 648, 651 (D.C. Cir. 1995). In this case, a diligent district judge held two days of evidentiary hearings, eventually whittling down the loss estimate to a core as to which Bras did not object. We find no error in the court's determination.

V

Bras' final contention is that his sentence was unreasonable because the district court failed to adequately consider the sentencing factors listed in the Sentencing Reform Act, 18 U.S.C. § 3553(a). Appellant's Br. 27. *Booker* does require sentencing courts to consider the § 3553(a) factors. 543 U.S. at 259-60. As we have noted before:

> These include the (now advisory) range established by the Guidelines. *See* 18 U.S.C. § 3553(a)(4). But they also include such factors as "the nature and circumstances of the offense and the history and characteristics of the defendant," *id.* § 3553(a)(1); the need for the sentence to "reflect the seriousness of the offense," to "promote respect for the law," to "provide just punishment," to "afford adequate deterrence," to "protect the public," and to "provide the defendant with needed . . . training [and] medical care," *id.* § 3553(a)(2); and the need to "avoid unwarranted sentence disparities" among similarly situated defendants, *id.* § 3553(a)(6).

*Simpson*, 430 F.3d at 1186; *see Cunningham*, 127 S. Ct. at 867. In this case, the district court expressly considered the § 3553(a) factors, and it did so in detail. The court explained that, among other things, it considered Bras' lack of criminal history, and his education, employment, finances, physical and mental health, and past and present family circumstances. Sentencing Hr'g Tr. 54-55 (Oct. 20, 2005). The district court is not required to refer specifically "to *each* factor listed in § 3553(a)," nor is it required "to explain sua sponte why it did not find [a particular] factor relevant to its discretionary decision" if "a defendant has not asserted the import of [that] factor." *Simpson*, 430 F.3d at 1186-87.

Bras does not deny that the court addressed many of the statutory factors; indeed, he does not suggest any relevant factor that the court failed to mention. Nonetheless, the defendant regards his 37-month sentence as unreasonable because it is "'greater than necessary[] to comply with the purposes' of sentencing as set out in the 3553(a)(2) factors." Appellant's Br. 27 (quoting 18 U.S.C. § 3553(a)). In support, he argues that the

court's consideration of certain specific sentencing factors was inadequate.

The government insists that we may review this claim only for "plain error," because Bras did not argue in the district court that his "37-month term was 'unreasonable,' or object that the court did not adequately consider the factors" set forth in § 3553. Gov't Br. 59. The plain error test does apply to objections that should have been raised at sentencing. *See Booker*, 543 U.S. at 268. Reasonableness, however, is the standard of *appellate* review, *see id*. at 262, not an objection that must be raised upon the pronouncement of a sentence. As the Seventh Circuit has held:

> To insist that defendants object at sentencing to preserve appellate review for reasonableness would create a trap for unwary defendants and saddle busy district courts with the burden of sitting through an objection -- probably formulaic -- in every criminal case. Since the district court will already have heard argument and allocution from the parties and weighed the relevant § 3553(a) factors before pronouncing sentence, we fail to see how requiring the defendant to then protest the term handed down as unreasonable will further the sentencing process in any meaningful way. Certainly we do not mean to . . . suggest that our longstanding insistence on proper objections as to other sentencing issues, e.g., the application of a guideline adjustment, should be relaxed. All we conclude here is that our review of a sentence for reasonableness is not affected by whether the defendant had the foresight to label his sentence "unreasonable" before the sentencing hearing adjourned.

*United States v. Castro-Juarez*, 425 F.3d 430, 433-34 (7th Cir. 2005). We therefore proceed to apply the "'reasonableness' standard of review." *Booker*, 543 U.S. at 262.

Although Bras contends that the district court's analysis was inadequate in numerous respects, only two are worthy of comment. First, he argues that a 37-month sentence is unreasonable because his involvement in the conspiracy was exaggerated. "Mr. Armentrout was the leader of the conspiracy," Bras maintains, while he merely "stepped in to 'serve as his arms and legs'" after Armentrout was incapacitated. Appellant's Br. 28. We see no error in the court's decision, under U.S.S.G. § 3B1.1(a), to add four levels to Bras' offense level because he "was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." *Id.* § 3B1.1(a). "There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy," *id.* cmt. n.4, and the trial testimony readily established that the requirements of Guideline 3B1.1(a) were satisfied.

Nor was there anything inadequate about the court's more general consideration of this issue. As the court explained, Bras had "a leadership role and an organizational one in the sense that he had to organize [the conspiracy] to make it work both at Fort Meyer as well as the DPW in order to have the scheme actually continue, and under his leadership I think it increased." Sentencing Hr'g Tr. 37 (Oct. 20, 2005). Further, the court cited trial testimony that, "as soon as the defendant became asphalt superintendent, . . . he approached" DPW inspectors "about the bribes," and "either continued with those who had been doing it [or] recruited a new one." *Id.* He "certainly had substantial operational authority," *id.*, "was involved in . . . distributing the false tickets, . . . directed the dispatcher and certain personnel in terms of producing the false tickets, [and] got the cash to pay the

bribes and distribute[d]" them, *id*. at 38. The court further found that Bras had "minimized his role when he pled," *id*. at 52, and that "he blamed others [and] falsely denied the extent of his role." *Id*. at 53. We have no basis for second-guessing any of these determinations.

Bras' second contention is that his 37-month sentence creates an "unwarranted sentence disparit[y]," 18 U.S.C. § 3553(a)(6), with those of his co-conspirators, including DPW inspectors, who received sentences of probation. Appellant's Br. 30. But as the district court told Bras directly, his co-conspirators did not hold comparable positions, either in the conspiracy or in their workplaces, "nor were they paid the kind of salary that you were being paid in terms of your position." Sentencing Hr'g Tr. 58 (Oct. 20, 2005). Equally important, the co-conspirators who received probation provided substantial assistance in the investigation of the scheme, while Bras did not. "Without, frankly, the cooperators," the court explained, other "individuals would not have come forward [and] the extent of the scheme would not have been known." *Id*. at 59. The court found this distinction "very important," *id*. at 60, and rightly so, *cf*. U.S.S.G. § 5K1.1 (authorizing a downward departure from the Guidelines range when a defendant "has provided substantial assistance in the investigation or prosecution of another person who has committed an offense").

In sum, Bras has offered no basis for concluding that the district court's consideration of the relevant sentencing factors was inadequate, or that the sentence it imposed was otherwise unreasonable.

22

VI

For the foregoing reasons, the judgment of the district court is

*Affirmed*.