# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued October 16, 2013          Decided June 13, 2014

No. 11-3045

UNITED STATES OF AMERICA,
APPELLEE

v.

MORRIS B. FAHNBULLEH,
APPELLANT

———

Consolidated with 11-3047

———

Appeals from the United States District Court
for the District of Columbia
(No. 1:09-cr-00359-1)
(No. 1:09-cr-00359-3)

———

*Barbara E. Kittay*, appointed by the court, argued the cause and filed the briefs for appellant Morris B. Fahnbulleh.

*Charles B. Wayne*, appointed by the court, argued the cause and filed the briefs for appellant Joe O. Bondo.

*David P. Saybolt*, Assistant U.S. Attorney, argued the cause for appellee. With him on the brief were *Ronald C. Machen, Jr.*, U.S. Attorney, and *Elizabeth Trosman* and *Elizabeth H. Danello*, Assistant U.S. Attorneys.

Before: GARLAND, *Chief Judge*, SRINIVASAN, *Circuit Judge*, and SENTELLE, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* SENTELLE.

SENTELLE, *Senior Circuit Judge*:  Joe Bondo and Morris Fahnbulleh were charged with and convicted of several counts of fraud in connection with their work on a humanitarian aid program in Africa funded by an agency of the United States government.  They seek reversal of their conviction, or failing that, vacation of their sentences, alleging various errors made by the district court in the trial proceedings.  For the reasons stated herein, we affirm the judgment of the district court.

## BACKGROUND

The United States Agency for International Development ("USAID") initiated a food aid program, known as a Food-for-Work program, for the African country of Liberia.  Under the program, Liberian communities would provide labor to perform community projects such as digging wells and repairing roads, and laborers would receive food for their services.  To implement the program, the USAID contracted with humanitarian organization Catholic Relief Services ("CRS").  CRS in turn subcontracted with another humanitarian organization, World Vision, which administered the program in three counties in Liberia through its federated organization, World Vision International (hereinafter collectively referred to as "World Vision").  Appellants Morris Fahnbulleh and Joe Bondo worked for World Vision on the USAID subcontract from 2005 to 2007.  Bondo was a food monitor and Food-for-Work officer, and Fahnbulleh was the World Vision commodities manager in Liberia.

In 2009 Bondo and Fahnbulleh were arrested and charged with fraud allegedly committed on the Liberia Food-for-Work program. In particular, they were each charged with one count of conspiracy to defraud the United States (18 U.S.C. §§ 371, 2), one count of conspiracy to commit mail and wire fraud (18 U.S.C. §§ 1349, 2), four counts of mail fraud (18 U.S.C. § 1512(b)(1)), two counts of wire fraud (18 U.S.C. §§ 1343, 2), and four counts of false claims (18 U.S.C. §§ 287, 2). Bondo was further charged with two counts of witness tampering (18 U.S.C. § 1512 (b)(1)). Fahnbulleh and Bondo were tried together by a jury. Fahnbulleh was convicted on all counts, while Bondo was acquitted on the conspiracy to commit mail fraud and wire fraud count, but convicted on the other charges. Both were sentenced by the district court to 142 months imprisonment.

Bondo and Fahnbulleh now appeal their convictions and sentences.

## DISCUSSION

Between them, Bondo and Fahnbulleh make five main arguments on appeal: 1) they were denied a speedy trial; 2) the district court lacked subject matter jurisdiction and venue; 3) the district court erred by admitting two government exhibits into evidence; 4) the district court erred in denying a motion by Bondo for a mistrial; and 5) the district court improperly calculated Fahnbulleh's and Bondo's sentencing guidelines range. We discuss each argument below.

### A. Speedy Trial

After investigating allegations that fraud had been committed by World Vision employees during the Liberia Food-for-Work program, federal authorities arrested Fahnbulleh and

Bondo. Bondo was held for approximately seven months and Fahnbulleh approximately five months before being indicted. Both Bondo and Fahnbulleh argue that their cases should have been dismissed under the Speedy Trial Act ("STA"), 18 U.S.C. § 3161 *et seq.*

Appellants correctly point out that 18 U.S.C. § 3161(b) requires that "[a]ny information or indictment charging an individual with the commission of an offense shall be filed within thirty days from the date on which such individual was arrested . . . ." However, the STA provides for exclusion of certain periods from this 30 day limit. At the time of Bondo's and Fahnbulleh's arrests (two months apart) in mid-2009, the government filed motions seeking to exclude periods of delay from the 30 day limit. In particular, the government requested delays pursuant to § 3161(h)(8) of the STA, which excludes a period of time, "not to exceed one year," from the 30-day period if the government has requested assistance in obtaining evidence from a foreign country. In support of its motions, the government attached a letter sent in early 2009 from the U.S. Department of Justice ("DOJ") to the Liberian government, seeking documents relating to the alleged fraud in the Liberia Food-for-Work program. The district court granted the motions. In late 2009 Bondo and Fahnbulleh were indicted.

Fahnbulleh asserts that § 3161(h)(8)'s directive that the exclusion "not . . . exceed one year" suggests that before an exclusion is granted the district court must determine on the record what time period would be in the interest of justice and how that would outweigh the interest of the defendant and the public in a speedy trial. Fahnbulleh argues that the district court undertook no such review, making it appear that any length of time, not exceeding one year, requires no further examination. He contends that he was seriously prejudiced in his long wait for indictment, including loss of employment and financial

resources, and the anxiety, physical illness, and humiliation associated with prolonged detention. Fahnbulleh further contends that the balance of this prejudice against the government's alleged need to await additional foreign evidence was not considered or addressed by the district court. Bondo makes arguments similar to Fahnbulleh's, contending that the district court was obligated to look behind the reasons for the government's exclusion-of-time motion, requiring the government to set forth specific facts to warrant further extension, including detailed information about the status of the foreign evidence request, what actions the government had taken in the intervening months, what additional efforts it would make, and why an indictment could not be returned without the foreign evidence.

"We review a district court's Speedy Trial Act determination de novo as to matters of law, and for clear error as to findings of fact." *United States v. Stubblefield*, 643 F.3d 291, 294 (D.C. Cir. 2011) (internal citation, quotation marks, and alteration brackets omitted). Here, the government requested, and the district court granted, an extension of time under the STA pursuant to 18 U.S.C. § 3161(h)(8), which provides:

> Any period of delay, not to exceed one year, ordered by a district court upon an application of a party and a finding by a preponderance of the evidence that an official request . . . has been made for evidence of any such offense and that it reasonably appears, or reasonably appeared at the time the request was made, that such evidence is, or was, in such foreign country.

We agree with the government that § 3161(h)(8) sets out only two requirements: (1) that a request for foreign evidence be made; and (2) that it reasonably appears that the evidence is in

the foreign country. Referencing the early 2009 letter sent by DOJ to the government of Liberia requesting documents relevant to its investigation, the district court found by a preponderance of the evidence that a request had been made to Liberia for documents and that it reasonably appeared that these documents were in Liberia. The district court consequently granted the government's requests for a period of delay. We conclude that the district court did not clearly err in granting the § 3161(h)(8) delay periods.

## B. Subject Matter Jurisdiction and Venue

Prior to trial, the district court denied Fahnbulleh's motion for dismissal of his case for lack of subject matter jurisdiction and improper venue. Pursuant to 18 U.S.C. § 3231, "[t]he district courts of the United States shall have original jurisdiction . . . of all offenses against the laws of the United States." "[I]f an indictment or information alleges the violation of a crime set out in Title 18 or in one of the other statutes defining federal crimes, that is the end of the jurisdictional inquiry." *United States v. George*, 676 F.3d 249, 259 (1st Cir. 2012) (internal quotation omitted). Fahnbulleh and Bondo were charged with and found guilty of numerous crimes set out in Title 18. No more is necessary to establish subject matter jurisdiction.

Nevertheless, Fahnbulleh (and Bondo by adoption) argues that the district court should have granted his motion to dismiss his case for lack of subject matter jurisdiction because the evidence failed to demonstrate any agreement to defraud the United States, as opposed to an agreement to defraud private parties. Because that argument rests on the evidentiary proof at trial, it does not in fact impugn the district court's subject matter jurisdiction. Instead, it sounds in the nature of a claim that the evidence was insufficient to establish any conspiracy to defraud

the United States. So understood, we find the argument unpersuasive. Fahnbulleh's argument on this proposition proceeds as follows: in implementing the Food-for-Work program, the USAID contracted with Catholic Relief Services, which in turn contracted with Fahnbulleh's employer World Vision to administer the program in three counties in Liberia. World Vision had no privity with the United States. If World Vision did commit a crime, it was against CRS and not the United States, and disputes between private parties do not provide a basis for subject matter jurisdiction. While Fahnbulleh's argument is orderly, it is not ultimately persuasive.

A similar argument was rejected by the Supreme Court in *Tanner v. United States*, 483 U.S. 107 (1987). In that case, a Florida corporation—Seminole Electric Cooperative, Inc. ("Seminole")—received a bank loan for a power plant construction project which included an access road. The loan was guaranteed by the Rural Electrification Administration ("REA"), a credit agency of the United States Department of Agriculture. One of the defendants, Conover, was the procurement manager at Seminole; the other defendant, Tanner, was a friend of his who owned a limerock mine. During construction of the power plant, Conover's department at Seminole prepared two contracts favorable to Tanner to use Tanner's limerock in constructing the access road. At about this same time Tanner made payments to Conover for thousands of dollars, allegedly on their personal transactions. During performance of the two contracts, Conover made misrepresentations to Tanner's bonding company on the access road's state of completion. Conover and Tanner were subsequently indicted for and convicted of, *inter alia*, conspiracy to defraud the United States in violation of 18 U.S.C. § 371. *Id.* at 110-13. They argued that if they were guilty of a conspiracy to defraud, the target of the conspiracy was Seminole and not the United States. *Id.* at 129. The Supreme Court

disagreed, stating that "[i]f the evidence presented at trial was sufficient to establish that petitioners conspired to cause Seminole to make misrepresentations to the REA, then petitioners' convictions may stand." *Id.* at 132. So too here.

Evidence presented at trial of this case showed that pursuant to its contract with CRS, World Vision was to follow U.S. grant regulations and to provide U.S.-mandated reports on implementation of the Food-for-Work program. These reports were generated from the collection of raw data on eight forms. Many of the raw data forms referenced the USAID funding; Bondo signed and verified many of these forms; and Fahnbulleh verified their accuracy. Included among the U.S.-mandated reports were recipient status reports ("RSRs") and commodity status reports ("CSRs"), to be provided monthly to CRS, as well as financial reports and narrative reports, to be provided quarterly. CRS in turn reformatted these reports and sent them on to USAID. Furthermore, the evidence showed that Fahnbulleh was involved in sending the CSRs, RSRs, and narrative reports to Washington, D.C., at times emailing the reports to Washington himself. As in *Tanner*, "the evidence presented at trial was sufficient to establish that [Fahnbulleh and Bondo] conspired to cause [CRS] to make misrepresentations to [USAID] . . . [Fahnbulleh's and Bondo's] convictions may stand."

\*   \*   \*   \*   \*

Fahnbulleh goes on to argue that the district court erred in denying his motion to dismiss his case for lack of venue. He further argues that the court again erred when it denied his request for a jury instruction on venue. According to Fahnbulleh, venue was not proper here because none of the alleged co-conspirators ever stepped foot into the District of Columbia. He claims that any acts committed within D.C.

constituted only innocent acts of U.S. government employees, paying claims submitted by CRS. First, we note that venue for a conspiracy prosecution lies anywhere an overt act is committed. *United States v. Rosenberg*, 888 F.2d 1406, 1415 (D.C. Cir. 1989). As noted in our subject matter jurisdiction discussion above, Fahnbulleh and Bondo caused fraudulent reports to be sent to Washington in furtherance of the conspiracy. For the same reason, venue was proper for the substantive offenses. Pursuant to 18 U.S.C. § 3237(a), mail fraud "may be inquired of and prosecuted in any district . . . into which such commerce [or] mail matter moves." Also, pursuant to 18 U.S.C. § 3732(a), venue for wire fraud lies in any jurisdiction to or from which the communication was transmitted. Finally, venue for false claims is properly laid where, *inter alia*, the claim is received. *See United States v. Leahy*, 82 F.3d 624, 633 (5th Cir. 1996).

As to the failure of the district court to deliver the proffered instruction on venue to the jury, we perceive no reversible error. It is established law in this circuit with respect to venue instructions that a venue "instruction is necessary only when the question of venue is genuinely in issue." *United States v. Haire*, 371 F.3d 833, 840 (D.C. Cir. 2004). Various courts have dealt differently with the question of when venue is at issue so as to require an instruction. *See United States v. Perez*, 280 F.3d 318, 333–35 (3d Cir. 2002) (collecting cases). In *Haire*, we expressly adopted and followed the Third Circuit's analysis in *Perez*, concluding "that the instruction is necessary only when the question of venue is genuinely in issue." 371 F.3d at 840. The *Perez* holding establishes that

> Even if a defendant properly objects to venue . . . it does not become a fact question for the jury unless and until the defendant also places it in issue by establishing a genuine issue of material fact with regard to venue.

280 F.3d at 335.

The unrebutted evidence discussed above clearly established that there is no genuine issue of material fact with reference to venue, and the refusal of the district judge to offer the venue instruction is not error.

### C. Admission of Government Exhibits 100 and 104

Over objection of defense counsel, the trial judge admitted into evidence Government Exhibits 100 and 104. Exhibit 100 consisted of 36 binders containing over 10,000 pages of raw data collected, using eight different forms, on the Liberia Food-for-Work program. The government called to the witness stand Eric Fullilove, Chief Financial Officer of World Vision International, to authenticate the contents of Exhibit 100. It was admitted into evidence under Fed. R. Evid. 803(6), the business records exception to the hearsay rule. That rule provides for the admission of

> [a] memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record or data compilation, all as shown by the testimony of the custodian or other qualified witness . . . unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness.

Fahnbulleh and Bondo both argue that the district court erred in allowing into evidence Government Exhibit 100.

Fahnbulleh contends that the government did not demonstrate authenticity or trustworthiness as required by Rule 803(6), because Fullilove had no personal familiarity with the documents as he did not work at World Vision until after the project was completed; he reviewed but did not conduct the audit of the records; and he had never been to Liberia.  For his part, Bondo argues that Fullilove's testimony to admit Exhibit 100 failed in fulfilling Rule 803(6)'s requirement that the information in the records be transmitted by a person with knowledge.  According to Bondo, the district court admitted the 36 binders comprising Exhibit 100 on nothing more than Fullilove's conclusory statement that the records were maintained by World Vision in the ordinary course of business. Since these records were the "guts of the government's documentary evidence against" him, argues Bondo, their admission into evidence without a proper foundation affected his substantial rights.

We review the district court's admission of  business records for abuse of discretion.  *United States v. Gurr*, 471 F.3d 144, 151 (D.C. Cir. 2006).  As Fahnbulleh correctly notes, under Fed. R. of Evid. 803(6), records of a regularly conducted activity are to be admitted at trial as an exception to the rule against hearsay if: (A) the records were made at or near the time by someone with knowledge; (B) the records were kept in the course of a regularly conducted activity of, *inter alia*, a business or organization; (C) making the records was a regular practice of that activity; (D) all these conditions are shown by the testimony of the custodian or another qualified witness; and (E) neither the source of information nor the method or circumstances of preparation indicate a lack of trustworthiness.

We conclude that the district court did not abuse its discretion in admitting Exhibit 100.  Even assuming the evidence was admitted for the truth of the matters asserted, *but*

*see Anderson v. United States*, 417 U.S. 211, 220 (1974) (statements are not hearsay if "the point of the prosecutor's introducing those statements was simply to prove that the statements were made so as to establish a foundation for later showing . . . that they were false"), all of the requirements for admission of the evidence as business records were met. First, Fullilove testified that the forms making up Exhibit 100 were prepared by World Vision employees as part of their job responsibility throughout the course of the Food-for-Work program. Second, Fullilove testified that all the forms were maintained in the ordinary course of business. Third, Fullilove testified that these forms were similar to the forms regularly maintained in its other branches. Fourth, Fullilove was World Vision International's Chief Financial Officer, and as such was familiar with the forms and circumstances of their creation. Furthermore, he testified that he had supervised and reviewed the forensic audit of World Vision International that had collected and analyzed the forms. We have held that the "custodian [of the records] need not have personal knowledge of the actual creation of the document." *United States v. Adefehinti*, 510 F.3d 319, 325 (D.C. Cir. 2007) (internal citation and quotation marks omitted). Finally, there was no evidence that the documents presented in court were not reliable reports of the data that had been entered.

\* \* \* \* \*

Exhibit 104 consisted of a summary of the forms in Exhibit 100. It was admitted pursuant to Fed. R. Evid. 1006, through Fullilove. Rule 1006 permits admission of an exhibit summarizing "[t]he content of voluminous writings . . . that cannot be conveniently examined in court." For a summary of documents to be admissible, the documents must be so voluminous as to make comprehension by the jury difficult and inconvenient; the documents themselves must be admissible; the

documents must be made reasonably available for inspection and copying; the summary must be accurate and nonprejudicial; and the witness who prepared the summary should introduce it. *United States v. Hemphill*, 514 F.3d 1350, 1358 (D.C. Cir. 2008).

Bondo (and Fahnbulleh by adoption) argues that the district court erred in admitting the Government's Exhibit 104 because its admission failed to satisfy the requirements of Rule 1006. In particular, Bondo asserts, again, that the raw data of Exhibit 100 was not itself admissible, and furthermore that the summary was not prepared by the witness who introduced it, Fullilove. We have already rejected the argument that Exhibit 100 was not itself admissible. And although Fullilove did not prepare Exhibit 104 himself, he testified that he supervised a team of auditors who reviewed the raw data and prepared the summary, and that he then reviewed the summary. We have previously approved introduction of summary testimony when the witness supervised others who prepared the summary. *United States v. Lemire*, 720 F.2d 1327, 1349 (D.C. Cir. 1983). We conclude that the district court did not err in admitting Exhibit 104.

## D. Denial of Mistrial

During closing arguments, the government in its rebuttal made seven references to "taxpayers" and their expectations of the Food-for-Work program. Counsel for both Bondo and Fahnbulleh objected. The district court agreed that these comments were improper and, as a remedy, instructed the jury to disregard the prosecutor's comments about taxpayers. On appeal, Bondo (and Fahnbulleh by adoption) argues that the district court erred in not declaring a mistrial, and that as a result his convictions should be reversed.

We review the district court's denial of a motion for mistrial for alleged prosecutorial impropriety in closing argument for abuse of discretion. *United States v. Becton*, 601 F.3d 588, 598 (D.C. Cir. 2010). In *United States v. Gartmon*, we noted:

> This court has used a relatively consistent set of criteria for evaluating the potential prejudice of closing argument errors. We have generally looked to three factors in determining whether improper remarks by the prosecutor sufficiently prejudiced a defendant: the closeness of the case, the centrality of the issue affected by the error, and the steps taken to mitigate the effects of the error.

146 F.3d 1015, 1026 (D.C. Cir. 1998) (internal quotation marks and citations omitted). Bondo argues that these three factors tilted in his favor. First, he contends that the closeness of his case was shown by his acquittal of conspiracy to commit mail and wire fraud. Second, he asserts that the value of the alleged misappropriations was inextricably bound up within the entirety of the case, and that there was no way to extricate the government's characterization of the alleged loss as one that was personal to each juror. Finally, he argues that the prosecutor's "taxpayer" argument was so improper that the district court's instruction could not ameliorate the unfair prejudice the argument caused.

We do not find these arguments persuasive. First, the case against Bondo (and Fahnbulleh) was not close: numerous documents and several witnesses all pointed to their guilt. Second, the "taxpayer" remarks by the prosecutor were not central to the issue of whether the defendants were guilty of fraud in submitting false documents. Third, the district court told the jury to "disregard the comments that were made about the taxpayers," and further instructed them that "[t]his is a case

of the United States versus the two defendants.  It's not a case of the taxpayers against the defendants.  That's not what this case is about."  We conclude that the improper remarks by the prosecutor did not prejudice the defendants, especially in light of the judge's curative instruction.  The district court thus did not abuse its discretion in not declaring a mistrial.

## E.  Sentencing

At sentencing, the district court determined that under the United States Sentencing Guidelines ("USSG" or "Guidelines") both Fahnbulleh's and Bondo's base offense level was 7.  The district court then enhanced each offense level: by 16 points pursuant to USSG §2B1.1(b)(2)(C) for a calculated loss of $1.9 million; by 6 points pursuant to USSG §2B1.1(b)(1)(I) for 250 or more victims; and by 4 points pursuant to USSG §3B1.1(a) for being an organizer or leader of a criminal activity involving five or more people.[1]

Fahnbulleh and Bondo argue that their cases should be remanded for re-sentencing, contending that the district court improperly calculated their Guidelines ranges.  Fahnbulleh contends that the district court's finding of a loss of $1.9 million was in error because the jury's verdict demonstrated that the only misconduct unanimously found involved falsification of documents and some work done at personal residences.  Second, Fahnbulleh claims that the district court's finding of 250 or more victims was in error because this number was never submitted to the jury, and in finding this number the district court relied solely on sentencing letters submitted by individuals who distributed food.  Third, he argues that he was not an organizer

---

[1] An additional two point enhancement, not at issue here, was added to Bondo's offense level pursuant to USSG §3C1.1 for obstructing the investigation.

or leader of any criminal activity because the evidence showed that it was not he but his co-conspirators who gave the instructions regarding the falsification of documents and the work done at personal residences.

Bondo argues that the government failed to satisfy its burden of establishing through reliable, specific evidence any amount of loss, much less a $1.9 million loss. The only evidence proffered to support the figure, according to Bondo, were the unsworn hearsay statements of 258 village leaders from the communities covered by the food distribution program. Bondo contends that the district court merely speculated that the actual loss was equal to the amount World Vision agreed to pay for reimbursement. Consequently, Bondo argues, the district court's $1.9 million loss calculation is unsupportable and unreasonable. And concerning the number of victims calculated by the district court, Bondo argues that because the government failed to satisfy its burden of establishing an amount of loss with reliable and specific evidence, the district court was precluded from finding that there were any victims because victims are only those who sustain any actual loss.

At sentencing, the district court may make findings of fact under a preponderance-of-the-evidence standard. *See United States v. Bras*, 483 F.3d 103, 107-08 (D.C. Cir. 2007). The district court may even rely on evidence that would be inadmissible at trial, as long as that evidence has "sufficient indicia of reliability to support its probable accuracy." *Id.* at 109 (internal quotation marks and citation omitted). In reviewing a sentencing decision, this court reviews for clear error factual findings made by the district court, and gives "due deference" to the district court's application of the Guidelines to the facts. *United States v. Saani*, 650 F.3d 761, 765 (D.C. Cir. 2011).

As noted, both Fahnbulleh and Bondo argue that the district court erred in enhancing their offense levels by 16 points pursuant to USSG §2B1.1(b)(2)(C) for a calculated loss of $1.9 million. The district court did not clearly err in finding a loss of $1.9 million. At sentencing, the district court stated that the evidence clearly showed a loss of $1.9 million. In support of this statement, the court made reference to an internal audit of the Liberia Food-for-Work program conducted by World Vision showing this amount of loss. Furthermore, the court noted that evidence presented at trial supported this amount. That evidence included testimony presented by the government that World Vision International repaid $1.9 million to the United States government in compensation for the conspirators' fraud. *See United States v. Bisong*, 645 F.3d 384, 398 (D.C. Cir. 2011) ("For sentencing, the loss amount need only be a reasonable estimate of the loss based on the available information."). We conclude that the district court made a reasonable estimate of loss.

Both Bondo and Fahnbulleh also argue that the district court erred in enhancing their offense levels by 6 points pursuant to USSG §2B1.1(b)(1)(I) for 250 or more victims. Prior to sentencing, the government submitted to the court a summary exhibit detailing the amount of lost food as calculated by World Vision International examiners; the summary was based on interviews conducted by the examiners of leaders in 258 towns in which food was claimed to have been distributed. The district court at sentencing made reference to three of these interviews, all three of which contained references to more than 100 people who performed work but did not receive food. The court stated that consequently by a preponderance of the evidence the number of victims who had worked for the Food-for-Work program was in excess of 250. We conclude that it was reasonable for the district court to rely on the three interviews, which was more than sufficient to put the number of victims

over the 250 required by USSG §2B1.1(b)(1)(I).

Finally, Fahnbulleh argues that the district court erred in enhancing his offense level by 4 points pursuant to USSG §3B1.1(a) for being an organizer or leader of a criminal activity involving five or more people. At Fahnbulleh's sentencing the district court stated that the evidence presented at trial showed that Fahnbulleh held "a position of hierarchy" in the conspiracy, and that "at least five people were acting at his behest." That evidence consisted of testimony from five witnesses who admitted to committing fraud during the Food-for-Work program and testified that they were supervised by Fahnbulleh (and Bondo, among others). We conclude that the district court did not clearly err in finding that Fahnbulleh was an organizer or leader of a criminal activity involving five or more people.[2]

## CONCLUSION

We have carefully considered all of defendants' arguments. For the reasons stated above, the judgment of the district court is affirmed.

---

[2]We have given full consideration to other arguments raised by the appellants and find none require separate discussion.